253 S.E.2d 114 (1979)
Judy TELLER and Barbara Hager
v.
Martin McCOY.
No. CC900.
Supreme Court of Appeals of West Virginia.
Decided December 12, 1978.
Opinion Concurring in Part and Dissenting in Part January 30, 1979.
Opinion Concurring in Part and Dissenting in Part February 21, 1979.
*117 Roxanne Rogers, Elkview, Daniel F. Hedges, Charleston, for plaintiffs.
Bailey & Parks, Thomas R. Parks, Logan, for defendant. *115
*116 McGRAW, Justice:
This proceeding is before us on certified question. Pursuant to W.Va. Code § 58-5-2, the Circuit Court of Logan County, West Virginia, certified to this Court the following questions of law upon the joint motion of the plaintiffs and defendant, after first denying plaintiffs' motions for "partial summary judgment and judgment on the pleadings":
1. Whether failure of a landlord to maintain rental premises in a habitable condition and otherwise remedy defects to the premises which render the residence uninhabitable is in violation of a landlord's implied warranty of habitability to a tenant? And if so, whether it is subject to waiver?
2. Whether a landlord's warranty of habitability and the tenant's covenant to pay rent are mutually dependent?
3. Whether failure of a landlord to maintain the premises in habitable condition constitutes a failure of consideration and a breach of the rental agreement?
4. Whether a landlord's breach allows to the tenant one or more of the following remedies: (a) a right of action or setoff for the difference between the agreed rent and the fair rental value of the premises in their defective condition; (b) after reasonable notice and opportunity to a landlord to correct the defective conditions, to repair the defects himself and deduct the repair cost from the rent; and (c) vacation of the premises terminating a tenant's obligation to pay rent? (d) what damages, if any, are recoverable by the landlord or tenant in the event of breach of either party.
5. Whether a breach of the implied warranty of habitability is a defense to a landlord's action for rent, damages, or unlawful detainer?

I
At common law, a lease for real estate was considered a conveyance or sale of an estate in land for a term. 2 R. Powell, The Law of Real Property § 221(1) (Rohan ed. 1977). A burden of inspection was placed upon the tenant and "[f]raud apart, there [was] no law against letting a tumble-down house." Robbins v. Jones, 15 C.B.N.S. 221, 240, 143 Eng.Rep. 768, 776 (1863).[1] The only way that a tenant at common law could assure the fitness of a leasehold was by exacting an express covenant from the landlord that the property was to be fit for the purpose intended. Cowan v. One Hour Valet, Inc., 151 W.Va. 941, 157 S.E.2d 843 (1967); Lennox v. White, 133 W.Va. 1, 54 S.E.2d 8 (1949); Redden v. McCreery, 123 W.Va. 367, 15 S.E.2d 150 (1941); Charlow v. Blankenship, 80 W.Va. 200, 92 S.E. 318 (1917); Kline v. McLain, 33 W.Va. 32, 10 S.E. 11 (1889); Arbenz v. Exley, 52 W.Va. *118 476, 44 S.E. 149 (1903). Absent a statute to the contrary, it was uniformly held that there was no implied warranty of habitability or fitness for the purpose leased. Clifton v. Montague, 40 W.Va. 207, 21 S.E. 858 (1895); see Wilkinson v. Searls, 155 W.Va. 475, 184 S.E.2d 735 (1971); 1 American Law of Property § 3.45 (Casner ed. 1952); 2 R. Powell, The Law of Real Property § 225 (Rohan ed. 1977); 3 Holdsworth, A History of English Law, 122-23 (5th ed. 1966). "The common law focused on possessions rather than service. The ideal landlord delivered possession, then did nothing more; the ideal tenant paid his rent and demanded nothing more than possession." Note, 56 Cornell L.Rev. 489, 490 (1971).
The acceptance of such rules in this state, as well as in most American common law jurisdiction, is exemplified by syllabus point 1 of Charlow v. Blankenship, supra, which provides:
There is no implied covenant upon the part of the landlord in a lease that the premises are tenantable or reasonably suitable for occupation. In the absence of fraud or concealment by the lessor of the condition of the property at the date of the lease, the rule of caveat emptor applies.
These rules developed out of an agrarian economy beginning in the Middle Ages at a time when the land, not the simple buildings and fixtures, was the focal point of the transaction. The right to possession of the land was the chief element of the exchange. The rent was deemed to issue from the land itself "without reference to the condition of the buildings or structures upon it." Hart v. Windsor, 12 M. & W. 68, 81, 52 Eng.Rep. 1114, 1119 (1843). Thus, the rent was due even if the buildings were not habitable or fit for occupancy.[2] 2 F. Pollock & F. Maitland, The History of English Law 131 (2d ed. 1923). This strict application of caveat emptor was consistent with the agrarian social setting under which the leasehold interests were created. It was accepted that the small, simple structures affixed to realty would be repaired by the farmer-tenant.[3] The condition of such premises normally was as readily apparent to the prospective tenant as it was to the landlord. Latent defects were not likely to exist due to the lack of the complicated, often imperceptible, modern refinements that characterize residential structures today. See the excellent historical discussion in Green v. Superior Court, 10 Cal.3d 616, 111 Cal.Rptr. 704, 517 P.2d 1168 (1974) (en banc).
But as society evolved, so did the setting under which the common law landlord-tenant relationship existed. English and American courts began to relax somewhat the settled common law rules.[4] The courts, *119 recognizing that some tenants primarily seek living quarters and not land, implied a warranty of habitability into short-term leases of furnished dwellings. Smith v. Marrable, 11 M. & W. 5, 152 Eng.Rep. 693 (Ex.1843); Ingalls v. Hobbs, 156 Mass. 348, 31 N.E. 286 (1892);[5]Young v. Povich, 121 Me. 141, 116 A. 26 (1922); Pines v. Perssion, 14 Wis.2d 590, 111 N.W.2d 409 (1961). Where the lease was for an apartment or room that later was totally destroyed by fire, the courts discharged the tenant from future rent, again recognizing that the tenant's true object in such cases was not land, but a place to live. Graves v. Berdan, 26 N.Y. 498 (1863); see Arbenz v. Exley, 52 W.Va. 476, 44 S.E. 149 (1903) & W.Va.Code § 37-6-28. And where a lease, restricting the lessee to a particular use, was accepted before the premises were completely constructed or altered, the courts made an exception to the no-implied warranty rule. See, e. g., Woolford v. Electric Appliances Co., 24 Cal.App.2d 385, 75 P.2d 112 (1938); J. D. Young Corp. v. McClintic, 26 S.W.2d 460 (Tex.Civ.App.1930), rev's on other grounds, 66 S.W.2d 676 (Tex.Comm'n App. 1933); Hardman Estate v. McNair, 61 Wash. 74, 111 P. 1059 (1910). A further historical adjustment to the no-repair rule occurred when the establishment of "a well recognized exception," Weaver Mercantile Co. v. Thurmond, 68 W.Va. 530, 70 S.E. 126 (1911), concerning premises used in common or remaining under the landlord's control. Charlow v. Blankenship, supra. "[T]he law imposes on a landlord the duty to exercise ordinary care to maintain in reasonably safe condition, premises owned by him and used in common by different tenants . . the duty arises from the tenancy . . ." syl. pt. 1, Marsh v. Riley, 118 W.Va. 52, 188 S.E. 748 (1936); accord, Lennox v. White, 133 W.Va. 1, 54 S.E.2d 8 (1949); syl. pt. 2, Barker v. Withers, 141 W.Va. 713, 92 S.E.2d 705 (1956).
At common law the lease was a conveyance of possession of real property for a term. The covenants in a lease were deemed to be independent, not dependent. Thus the duty of a tenant in possession to pay rent was accepted as essentially absolute. See, e. g., King v. Moorehead, 495 S.W.2d 65 (Mo.Ct.App.1973). But the courts implied into leases a "covenant of quiet enjoyment" to relieve a tenant from the obligation to pay rent when he was deprived of possession or disturbed by hostile claimants or defects in title. Under this doctrine, the landlord, through his acts or omissions, was deemed to "evict" the tenant by depriving him of the beneficial enjoyment of the demised premises. Dyett v. Pendleton, 8 Cow. 727 (N.Y.1826); Edgerton v. Page, 20 N.Y. 281 (1859); see Wilkinson v. Searls, 155 W.Va. 475, 184 S.E.2d 735 (1971). Thus a tenant compelled to vacate any or all of an unfit and uninhabitable dwelling was deemed to be constructively "evicted" under law and was relieved from further rent liability.[6] This doctrine *120 of constructive eviction was created by the courts to serve as a "substitute for the dependency of covenants in a large class of cases . . ." Lemle v. Breeden, 51 Haw. 426, 462 P.2d 470 (1969) quoting Lesar, Landlords and Tenant Reforms, 35 N.Y. U.L.Rev. 1279, 1282 (1960). See also King v. Moorehead, 495 S.W.2d 65, 69-70 (Mo.Ct. App.1973); 1 American Law of Property § 3.50 at 278 (Casner ed. 1952). "This rule allowed the court to mitigate some of the injustices stemming from strict application of the independent covenants rule without repudiating the rule's basic premise that the lease was essentially a conveyance of a possessory interest in land for a term and not a contract for a dwelling suitable for human occupation." Boston Housing Authority v. Hemingway, 363 Mass. 184, 189-90, 293 N.E.2d 831, 837 (1973).
Certified Question No. 4(c) asks whether the landlord's failure to maintain the premises in a fit and habitable condition would allow the tenant to vacate the premises thereby terminating the allegation to pay rent. Constructive eviction, recognized in Wilkinson v. Searls, supra, would afford the tenant that remedy.
Since W.Va.Const. art. 8, § 21 and such cases as Cunningham v. County Court, 148 W.Va. 303, 308, 134 S.E.2d 725 (1964) hold that drastic changes in the common law can be made only by the Legislature, we must next review those relevant changes that have been effectuated by statute.
In W.Va.Code § 29-3-2 the Legislature declared and found that "[a] significant part of the population of this State needs improved fire prevention and control . ." and that "[a]dequate fire prevention and control are not likely to become a reality unless certain administrative functions and procedures are enacted by law . . . ." A State Fire Commission was created, W.Va.Code § 29-3-3, and was granted the power to "promulgate, amend and repeal regulations for the safeguarding of life and property from the hazards of fire and explosion. . ." which regulations "shall have the force and effect of law" statewide. W.Va.Code § 29-3-5. W.Va.Code § 29-3-12(c) provides that the State Fire Marshal shall enforce these regulations.
We take judicial notice that these regulations, in June, 1976, were filed in the office of the Secretary of State and that the State Fire Commissioner therein adopted, as its regulations, the National Fire Code published by the National Fire Protection Association, the National Building Code, and promulgated itself certain additional regulations covering topics such as explosives, liquified petroleum gases, schools, high rise buildings, fire alarms, sprinklers and delapidated buildings.
These voluminous and detailed regulations, which fill eighteen separate volumes and thousands of pages, deal with such things as electricity, heating, plumbing, roofing, building materials, lights, ventilation, stairways, doors, basements, chimneys and walls. Section 2.02 provides that, "no person shall occupy or use, or permit the occupation or use of a building or structure or any part thereof which has been erected or altered in violation of the provisions of these regulations." This prohibition appears with equal force in W.Va.Code § 29-3-14(a) as follows:
No person shall erect, construct, reconstruct, alter, maintain or use any building, structure or equipment or use any land in such a way to endanger life or property from the hazards of fire or explosion, or in violation of any regulation, or any provision or any change thereof promulgated by the state fire commission under the authority of this article.
*121 Our Legislature in W.Va.Code § 16-1-7 gave the State Board of Health
"The power to promulgate such rules and regulations . . . as are necessary and proper to effectuate the purposes of [chapter 16] and prevent the circumvention and evasion thereof . . . Such rules and regulations shall include, but not be limited to, the regulation of . . the sanitary conditions of . . . sources of water supply, sewerage facilities and plumbing systems . . . and the design of all water systems, plumbing systems [and] sewerage systems."
Pursuant to this, effective February 1, 1975, the West Virginia State Board of Health adopted the following regulations:
"3.1 . . . [E]very dwelling or establishment whether publicly or privately owned where persons reside, assemble, or are employed, shall be provided with toilet facilities and a sanitary system of sewage or excreta disposal.
2.5 Dwelling [definition]  A building structure or place used or intended to be used for human occupancy as a single family or multi-family residence.
2.19 Sewage [definition]  Any liquid waste containing animal, vegetable and/or mineral matter in suspension or solution including, but not limited to, waste from water closets, urinals, lavatories, bathtubs, laundry tubs, washing machines, drinking fountains, sinks, kitchen equipment and other sanitary fixtures or facilities."
W.Va.Code § 8-12-13 grants to municipalities the plenary power to regulate the plumbing, wiring, erection, construction, repair, and alteration of structures. In W.Va. Code § 8-12-16 municipalities are granted the plenary power and authority "to adopt ordinances regulating the repair, alteration or improvement, of the vacating, and closing or removal or demolition, or any combination thereof, of any dwelling or other buildings unfit for human habitation . ."
On March 6, 1978, effective ninety days thereafter, our Legislature passed an amendment and reenactment of W.Va.Code 7-1-37 which therein confers upon county commissions of counties with a population of 45,000 or more the power "to adopt building and housing codes establishing and regulating minimum building and housing standards for the purpose of improving the health, safety and well-being of its citizens."[7]
The Legislature "in order to promote and protect the health, safety, morals and welfare of the public," W.Va.Code § 16-15-2, provided for the creation of a corporate housing authority where the governing body of a city or county finds that "unsanitary or unsafe inhabited dwelling accommodations exist" or "that there is a shortage of safe or sanitary dwelling accommodations in such city or county" upon consideration of such factors as "the sanitary facilities, and the extent to which conditions exist in such buildings which endanger life or property by fire or other cause." W.Va. Code § 16-15-3. Such authority has the power "to investigate into living and housing conditions in the city and into the means and methods of improving such conditions; to determine where unsanitary or substandard housing conditions exist; to study and make recommendations concerning. . . areas in which unsanitary or substandard conditions exist . . ." W.Va.Code § 16-15-7, and to establish and operate housing projects that provide "decent, safe and sanitary dwelling accommodations." W.Va.Code § 16-15-17.
The Legislature passed the Housing Cooperation Law in an attempt to aid in the establishment of housing projects and declared "that there exist[s] in the State unsafe and unsanitary housing conditions and a shortage of safe and sanitary dwelling accommodations for persons of low income; that these conditions necessitate excessive *122 and disproportionate expenditures of public funds for crime prevention and punishment, public health and safety fire and accident protection, and other public services and facilities; and that the public interest requires the remedying of these conditions." W.Va.Code § 16-16-2 (emphasis added). This Housing Corporation Law granted to state public bodies the power to enter into agreements to repair, close, or demolish unsafe, unsanitary or unfit housing projects. W.Va.Code § 16-16-4.
Also, the Legislature, finding "a serious shortage of sanitary, decent and safe residential housing," W.Va.Code § 31-18-2(a), enacted the West Virginia Housing Development Fund Act in an effort to make available more housing of that nature.
Thus, the Legislature, having declared, "that the public interest requires the remedying of these conditions," W.Va.Code § 16-16-2, has for some time been aware of the problems that emanate from uninhabitable dwellings and has made substantial efforts to deal with them by providing appropriate habitable housing, by having the State Fire Commission and State Department of Health impose requirements upon landlords, and by empowering municipalities and county commissions to enact and enforce building codes and health regulations. The Legislature has clearly embarked on a course to change the common law no-repair rule and its correlative doctrine of caveat emptor by recognizing that urban tenants seek not just space, but a habitable place to live.[8]See King v. Moorehead, 495 S.W.2d 65 (Mo.Ct.App.1973) and Boston Housing Authority v. Hemingway, 363 Mass. 184, 189-90, 293 N.E.2d 831, 840-2 (1973) where these courts faced with similar state statutes reached the same conclusion.
We therefore are compelled to agree completely with the following often-quoted passage from one of the pioneer American cases recognizing the implied warranty of habitability:
Legislation and administrative rules, such as the safeplace statute, building codes and health regulations, all impose certain duties on a property owner with respect to the condition of his premises. Thus, the legislature has made a policy judgment  that it is socially (and politically) desirable to impose these duties on a property owner  which has rendered the old common law rule obsolete. To follow the old rule of no implied warranty of habitability in leases would, in our opinion, be inconsistent with the current legislative policy concerning housing standards. The need and social desirability of adequate housing for people in this era of rapid population increases is too important to be rebuffed by that obnoxious legal cliche, caveat emptor. Permitting landlords to rent `tumbledown' houses is at least a contributing cause of such problems as urban blight, juvenile delinquency and high property taxes for conscientious *123 landowners. Pines v. Perssion, 14 Wis.2d 590, 595-96, 111 N.W.2d 409, 412-13 (1961).
We, therefore, hold that in a written or oral lease of residential premises,[9] there is an implied warranty that the landlord shall at the commencement of a tenancy, deliver the dwelling unit and surrounding premises in a fit and habitable condition, and shall thereafter maintain the leased property in such condition.[10]

II
The Legislature's progressive abrogation of the common law no-repair rule was crystallized on March 11, 1978, when it added to our landlord-tenant law W.Va.Code § 37-6-30, a new section which requires the landlord to deliver and maintain the rental dwelling unit in a fit and habitable condition.[11]
This Court today, by implying a warranty of habitability into residential *124 leases, intends in no way to impose upon the landlord a greater burden than that set forth by the Legislature in our new statute. The landlord's duty under the implied warranty and the statute are identical. That the case at bar arose before the effective date of the new statute is, then, of little consequence insofar as the landlord's duty is concerned.
But in order to answer fully the questions certified to us, we must deal with several topics not covered by the statute. Our treatment of these topics is intended, however, to guide not only the lower court which certified these questions to us but all courts of this state that will undoubtedly be called upon to deal with the new statute and these attending topics.
A. Mutual Dependency of Covenants
A lease under real property law was viewed as a conveyance for a term, and its covenants were not mutually dependent. Under such an interpretation, the duty to pay rent was not dependent upon the landlord's compliance with the terms of the lease. Thus, even if a landlord agreed in the lease to keep the premises in good repair, his failure to do so would not relieve the tenant of his independent duty to pay rent.
But this common law approach arose before the development in contract law of mutually dependent covenants. The authorities agree today that the modern lease is both a conveyance and a contract.[12] Corbin on Contracts, § 686 (1960 ed.); Thompson on Real Property, § 1110 (1959 replacement); Williston on Contracts, § 890 (3rd ed. Jaeger); Lesar, op. cit. supra. The cases adopting the implied warranty have likewise recognized that a residential lease must be treated as a contract. See, e. g., First National Realty Corp., supra, Green v. Superior Court, supra; Lemle v. Breeden, supra; Mease v. Fox, supra; Boston Housing Authority v. Hemingway, supra; King v. Moorehead, supra; Marini v. Ireland, supra. *125 Of the many cases that have implied a warranty of habitability into nonagrarian leases, none can be found which hold the implied warranty and the duty to pay rent to be independent. See Restatement (Second) of Property § 5.1 Comment b (1977).
Thus, our Legislature along with many American courts has acknowledged that the land is no longer the value sought by an urban tenant. What is sought is a place to live, not an estate in land. As Judge Skelly Wright said in Javins v. First National Realty Corp., 138 U.S.App.D.C. 369, 372-373, 428 F.2d 1071, 1074-75, cert. denied, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970), a leading case adopting the implied warranty of habitability:
When American city dwellers, both rich and poor seek `shelter' today, they seek a well known package of goods and services  a package which includes not merely walls and ceiling, but also adequate heat, light and ventilation, serviceable plumbing facilities, secure windows and doors, proper sanitation, and proper maintenance.. . . In our judgment the trend toward treating leases as contracts is wise and well considered.
Additionally, the growth in the number and detail of specific covenants in clauses found in leases regulating the use of the property further attests to their contractual nature. 2 R. Powell, Real Property ¶ 221[1] (1977); Lesar, op. cit. supra.
In response to the second certified question, we hold that since a lease of a residential dwelling unit is to be treated and construed as any other contract, the covenant to pay rent and the warranty of habitability are mutually dependent.[13]Franklin v. Pence, 128 W.Va. 353, 36 S.E.2d 505 (1945); Jones v. Kessler, 98 W.Va. 1, 126 S.E. 344 (1925).
B. Contractual Remedies
Upon recognizing that a lease for urban living quarters is essentially a contract, the courts have uniformly made available to the tenant faced with the material breach of warranty the same common law contract remedies of damages, reformation and rescission, see, e. g., Mease v. Fox, supra; Boston Housing Authority v. Hemingway, supra; Fritz v. Warthen, supra; King v. Moorehead, supra; Restatement (Second) of Property §§ 5.1-5.4 (1977), "a more consistent and responsive set of remedies. . ." Lemle v. Breeden, 51 How. 426, 462 P.2d 470 (1969). We, too, so hold.[14]
Therefore in further answer to Certified Question No. 4(c) as to whether the tenant faced with the landlord's breach of the warranty can vacate the premises and thereby terminate his obligation to pay rent, we need look only to the longstanding contract law of rescission. Breach of contract "so substantial as to tend to defeat the very object of the contract," syl. pt. 1, Holderby v. Harvey C. Taylor Co., 87 W.Va. 166, 104 S.E. 550 (1920); see J. W. Ellison, *126 Son & Co. v. Flat Top Grocery Co., 69 W.Va. 380, 71 S.E. 391 (1911) permits the injured party to rescind the contract. The warranty of habitability, a covenant upon which the very duty to pay rent depends, is certainly a vital and essential provision of the lease. Breach of this covenant, upon which the vitality of the lease depends, would entitle the lessee to rescind the lease, to vacate the premises and to be relieved of any further rental obligation. Because the typical residential tenant enters into a lease in order to obtain a habitable place to live, his failure to receive such a place to live would unquestionably justify rescission.
Certified Question 5 asks whether a breach of the implied warranty of habitability is a defense to a landlord's action for rent or damages. As is the case with many of the questions certified, the answer is to be found in the long-standing contract law of this jurisdiction. The answer to this particular question appears cogently in Franklin v. Pence, 128 W.Va. 353, 357, 36 S.E.2d 505, 508 (1945): "When the covenants are dependent and mutual, as here, a party who violates the contract cannot recover damages which result from its violation by the other party." Thus, breach by the landlord of the implied warranty of habitability, a material covenant upon which the duty to pay rent depends, may be raised as a defense in a landlord's action for rent. When the landlord sues for damages to the premises allegedly caused by the tenant, the tenant may raise breach of the implied warranty as a defense only to show that the damage to the premises resulted from and were caused by the landlord's breach of the implied warranty. When the landlord sues for damages and the tenant contends that the warranty of habitability was breached, but does not maintain that the damages were directly caused by the breach, the tenant could counterclaim for damages reasonably arising from the breach of the implied warranty of habitability.
As to the "repair and deduct" inquiry in Certified Question 4(b), our research reveals that only one of the many cases adopting the implied warranty, Marini v. Ireland, 56 N.J. 130, 265 A.2d 526 (1970), allows the tenant this remedy. We feel at this time, as have apparently the majority of courts dealing with the issue, that the wide range of contract remedies available to the tenant are adequate to enforce fulfillment of the implied warranty.
Along with these contractual remedies, of course, the tenant has certain responsibilities under the lease. For example, "Since the basic contract remedies are available to tenant, the basic contract duties are imposed upon him. The tenant is under an obligation to give landlord notice of a deficiency or defect not known to the latter." Mease v. Fox, 200 N.W.2d 791, 797 (Iowa 1972). Furthermore, "The contract principle that a person may not benefit from his own wrong will exonerate a landlord for a defect or deficiency caused by a tenant's wrongful conduct." King v. Moorehead, supra at 76, citing Javins v. First National Realty Corporation, supra, 138 U.S.App. D.C. 380 at n. 62, 428 F.2d 1082 at n. 62; Hinson v. Delis, 26 Cal.App.3d 62, 70, 102 Cal.Rptr. 661, 666 (1972); Mease v. Fox, supra at 797.
C. Unlawful Detainer
W.Va.Code § 55-3-1 et seq. provides for the action for unlawful detainer, the common remedy used to evict tenants who violate the lease in one respect or another. It provides the method for recovering possession or damages from the tenant who ". . . detain[s] the possession of any land, building, structure, or any part thereof after his right has expired . . ."
At common law, under the property principles discussed above, the landlord would prevail upon a mere showing that rent was not paid according to the lease and that possession was withheld. But when the covenants of a lease are viewed under contract law as being mutually dependent, the tenant's right to possession may not necessarily expire upon his failure to pay rent. The landlord's breach of warranty becomes directly related to the issue of possession.
*127 The tenant affirmatively alleging as a defense breach by the landlord of the implied warranty should be accorded the opportunity to show that his right to possession has not expired. In response to the fifth certified question, we hold that breach of the implied warranty is a defense to an action for unlawful detainer.[15]Accord, e. g., Javins v. First National Realty Corp., supra; Green v. Superior Court, supra; Jack Spring, Inc. v. Little, supra; Rome v. Walker, 38 Mich.App. 458, 196 N.W.2d 850 (1972); Fritz v. Warthen, supra; Foisy v. Wyman, supra.
D. The Measure of Damages
But while it is widely accepted that a residential lease is to be treated as a contract and that the common law remedies for breach are applicable, the courts addressing the issue have had great difficulty formulating an appropriate measure of damages applicable to a breach of implied warranty. See generally M. Moskovitz, The Implied Warranty of Habitability: A New Doctrine Raising New Issues, 62 Cal.L.Rev. 1444, 1464-73 (1974).
Some courts adopt the "difference in value" approach. Under this method, the "`tenant's damages [is] measured by the difference between the fair market value of the premises if they had been as warranted and the fair rental value of the premises as they were during occupancy by the tenant in the unsafe and unsanitary conditions'." Green v. Superior Court, 10 Cal.3d 616, 638, 111 Cal.Rptr. 704, 719, 517 P.2d 1168, 1183 (1974); Mease v. Fox, 200 N.W.2d 791, 797 (Iowa 1972); accord, Boston Housing Authority v. Hemingway, 363 Mass. 184, 192, 293 N.E.2d 831, 845 (1973); see W.Va.Code § 46-2-714(2). If the fair market value of an apartment in its defective condition is $100, yet would be worth $200 but for the breach of warranty, then the tenant sustains $100 per month in general damages. The actual monthly rent contracted for is irrelevant under this approach, except perhaps as evidence of the apartment's fair market value.
The other approach to ascertaining damages is the "percentage reduction of use" method first set forth in Academy Spires, Inc. v. Brown, 111 N.J.Super. 477, 268 A.2d 556 (Dist.Ct.1970) under which the court reduced the tenant's rental obligation by a percentage corresponding to the relative reduction of use of the leased premises caused by the landlord's breach. Under this method, if the tenant, due to the landlord's breach, is denied the use of ten percent of an apartment renting for $200, then the tenant sustained damages of $20.00 per month.[16]
*128 We feel that neither approach should be the exclusive mode of assessing damages in such cases. Of the two, the "difference in value approach" is far more widely accepted and we adopt it, in part, as the measure of damages in cases involving the breach of the implied warranty of habitability. But, money damages so assessed, while appropriate in the commercial cases, are inadequate in most residential landlord-tenant tenant cases, since the residential tenant who endures a breach of the warranty of habitability normally does not actually lose only money. The typical residential tenant rents a dwelling for shelter, not profit. When the warranty is breached, he loses, instead, such intangibles as the ability to take a bath or use hot water as frequently as he would like, he may be forced to worry about the health of his children endangered by rats, roaches, or other undesirable pests, or he may be denied the use of certain rooms in the apartment because there is odor, severe water leakage, or no heat. "When [the measure of damages] is difficult to apply because the property in question is not used commercially, it may be necessary to formulate a measure of damages that is more uniquely adapted to the plaintiff's injury." Jarrett v. E. L. Harper & Son, Inc., W.Va., 235 S.E.2d 362, 365 (1978).
We recently addressed this precise issue in Jarrett v. E. L. Harper & Son, Inc., supra, where the plaintiff's water well was destroyed by the defendant, a contractor building a sewer for a public service district. The plaintiffs, without water for five weeks while a new well was being completed, sued for "annoyance, inconvenience, and `general unpleasantness'." We held in that case at syllabus point 3 that, "Annoyance and inconvenience can be considered as elements of proof in measuring damages for loss of use of real property."
We feel that the true nature of the damages suffered by a tenant faced with a breach by the landlord of the warranty are not adequately measured by the exclusive use of the "difference in value" standard. Furthermore, the need for expert testimony under this approach could serve to deny the intended relief from a large number of low and middle income tenants who could not afford to litigate. Academy Spires, Inc. v. Brown, 111 N.J.Super. 477, 486, 268 A.2d 556, 562 (Dist.Ct.1970); Steinberg v. Carreras, 74 Misc.2d 32, 38, 344 N.Y.S.2d 136, 144 (N.Y. City Civ.Ct.1973).
Therefore, in response to the fourth certified question, we hold that when the warranty of habitability is breached, the tenant's damages are measured by the difference between the fair market value of the premises if they had been as warranted and the fair rental value of the premises as they were during the occupancy by the tenant in the unsafe and unsanitary condition. However, the tenant may additionally recover damages for annoyance and inconvenience proven to have resulted from the breach.
E. The Implied Warranty at Trial
The finder of fact in an action where the warranty of habitability is in issue must determine two things: (1) whether the implied warranty of habitability or fitness has been materially breached, and (2) how much of the tenant's rental obligation was abated or offset by virtue of the breach.
Under (1) the determination of whether a landlord breached the warranty is a question of fact to be determined by the circumstances of each case. The breach must be of a substantial nature rendering the premises uninhabitable and unfit. Thus minor housing code violations or other deficiencies which individually or collectively do not adversely affect the dwelling's habitability or fitness would not entitle the tenant to a reduction in rent.[17] In making the *129 determination of whether the premises were uninhabitable and unfit, housing code violations and deficiencies should be scrutinized in light of such things as their nature, the length of time they persisted, their effect on safety and sanitation, the age of the structure, and the amount of rent charged.
Under (2), if no material breach of the implied warranty is found, then a judgment for possession, rent, or damages may issue for the landlord. In an action for unlawful detainer, if the finder of fact concludes that the tenant's entire obligation to pay rent was suspended because of a total breach by the landlord, then the action for unlawful detainer will fail. And in an action for unlawful detainer, when it is found by applying the measure of damages set forth above that part, but not all, of the tenant's obligation for rent is suspended, the tenant must be given an opportunity to pay that part of the rent that is due. If the tenant fails to pay that sum within a reasonable period of time, then the Court should enter judgment on behalf of the landlord.
Whenever breach of the implied warranty is raised as a defense to the landlord's action for rent or as a defense or counterclaim to a landlord's action for damages, the properly instructed finder of fact should apply the measure of damages as set forth above and determine the amount of money owed the tenant due to the breach. This amount should be deducted from the total amount of rent or damages the tenant is found to owe the landlord, or, where the tenant has counterclaimed, may result in a money award to the tenant.
In some instances the tenant may maintain his own action for damages arising from the landlord's knowing breach of the warranty of habitability. In such cases, the measure of damages set forth above shall be used. But in such cases the landlord is permitted to raise as a defense that the tenant owes rent or is himself responsible for the unsanitary or unsafe condition of the premises. And, cases were the tenant affirmatively sues for breach of warranty, the landlord can counterclaim to recover for damages to the premises wrongfully caused by the tenant.
F. Protective Orders
In order to protect the landlord from the assertion of a frivolous implied warranty claim by a tenant in possession, to assure the landlord that any rent money adjudicated as owed to him will be available, and to encourage the landlord to make timely repairs so as to minimize a tenant's damages, several courts have held that the trial court, upon request, after determining that a fact questions exists as to a breach of warranty of habitability, may, during the pendency of the action, require the tenant in possession to make future rent payments or part thereof unto the court as they become due. Javins v. First National Realty Corp., 138 U.S.App.D.C. 369, 428 F.2d 1071, cert. denied, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970); Green v. Superior Court, 10 Cal.3d 616, 111 Cal.Rptr. 704, 517 P.2d 1168 (1974); Fritz v. Warthen, 298 Minn. 54, 213 N.W.2d 339 (1973); King v. Moorehead, 495 S.W.2d 65 (Mo.Ct.App.1973); Restatement (Second) of Property § 10.3 (1977). See Moscowitz, op. cit., supra at 1473-1486; Note, 28 Stan.L.Rev. 729, 769-772 (1976).
*130 The courts are sharply divided over whether these protective escrow orders should be allowed, and, where they are allowed, whether they should be the exception or the rule. We adopt the compromise approach set out in the leading case of Bell v. Tsintolas Realty Co., 139 U.S.App.D.C. 101, 430 F.2d 474 (1970). Such protective orders are not favored, but are permitted "only in limited circumstances, only on motion of the landlord, and only after notice and opportunity for a hearing on such a motion." Id. at 106, 430 F.2d at 479. According to Bell, the burden is on the landlord to show "an obvious need for such protection." Id. at 111, 430 F.2d at 484.
When ruling upon the motion for the protective order, the trial court may consider:
". . . the amount of rent alleged to be due, the number of months the landlord has not received even a partial rent payment, the reasonableness of the rent for the premises, the amount of the landlord's monthly obligations for the premises, whether the tenant has been allowed to proceed in the forma pauperis, and whether the landlord faces a substantial threat of foreclosure."
The "obvious need" of the landlord of the protective order is to be balanced against "the apparent merits of the tenant's defense." If the landlord proves his "obvious need," then the court may require the tenant in possession to make payments into the court pending disposition of the case. If the court believes that the tenant has a strong likelihood of succeeding on the merits, the court might refuse to enter a protective order. And if it both appears that the landlord has an "obvious need" and the tenant's claim some "apparent merit," the court might order that an amount less than the monthly contract rent be paid into the escrow account. See Blanks v. Fowler, 141 U.S.App.D.C. 244, 437 F.2d 677 (1971).
The trial court, in lieu of establishing a court-administered escrow account, or the parties by mutual agreement might establish a private escrow arrangement that adequately protects the landlord. Fritz v. Warthen, supra.
This escrowed money represents rent only for the period between the filing of suit and trial. At trial, the escrowed amount should be apportioned between the parties consistent with the final judgment.
Finally, the courts have been very reluctant to allow the turnover order, that is, the pre-judgment award to the landlord of part or all of an escrow account. We agree with this position. Courts may not invade escrow accounts before final judgment without the consent of the parties.
G. Waiver
Allowing a tenant to "waive" the warranty could be tantamount to permitting the landlord to violate some statute, regulation or code enacted for the benefit of not only that tenant, but future tenants, adjoining tenants and landowners as well. Certainly no one can waive the obligations imposed by law upon landlords, and no one, by contract or otherwise, can agree to permit a landlord to violate the law. A waiver by the tenant, the one normally most likely to detect, endure, and report such violations, would tend to insulate the landlord from liability for his illegal conduct. If a tenant is allowed to waive his rights arising from the landlord's breach of such ordinances, codes, statutes and regulations, a dilemma would ensue. If a tenant, after waiving the warranty, were to thereafter report violations of the law to the authorities charged with enforcement; the building could be condemned or appliances, water or utilities shut off leaving him with little or no civil recourse against the landlord. Since the tenant who has waived the implied warranty could suffer these severe consequences by reporting on illegality, it is not likely that he would be inclined to report the violations.
Additionally, since "[i]t is fair to presume that no individual would voluntarily choose to live in a dwelling that had become unsafe for human habitation" Bowles v. Mahoney, 91 U.S.App.D.C. 155, 161, 202 F.2d 320, 326 (1952) (Bazelon, J. *131 dissenting) we hold that waivers of the implied warranty of habitability are against public policy. Given the proliferation of "form leases" and the current scarcity of habitable dwellings, there exists a distinct danger that such waivers would become routine. If tenants seeking the scarce available shelter are compelled to waive their rights and accept uninhabitable dwellings, then the protection accorded by the implied warranty and the statutes could become meaningless.

III.
This Court, along with many others, has concluded that the harsh common law rules of property, riddled historically with numerous exceptions, no longer exclusively govern the residential lease in light of legislative enactments and intent. Since the rights and duties of the landlord and residential tenant must be viewed under contract principles, the tenant's duty to pay rent is dependent upon the landlord's fulfillment of the implied warranty of habitability.
There are several ways a tenant might enforce the implied warranty. A tenant may raise breach of warranty as a defense to an unlawful detainer action since the landlord's breach directly affects the right to possession even when the tenant is in arrears of rent. He may continue to pay rent and bring his own action later to recover damages caused by the landlord's breach with difference in value, annoyance and inconvenience being elements of proof, or, after vacating the premises and suspending rent payments, he may raise breach of warranty as a defense to an action by the landlord for rent.
Accordingly, the trial court's denial of the plaintiffs' motions for "judgment on the pleadings and for partial summary judgment" is reversed and, as both parties have requested, the case is to be remanded to the Circuit Court of Logan County for further proceedings consistent with this opinion.
Reversed.
NEELY, Justice, concurring in part, dissenting in part:[1]
It is a basic principle of American jurisprudence that a court cannot gratuitously pronounce what they envisage the law should be but must limit themselves to rulings in the context of a justiciable case or controversy. U.S.Const., art. 111, § 2; W.Va.Const., art. 8, § 3. The case at bar arose before the effective date of W.Va. Code, 37-6-3 [1978] and the justiciable question presented was limited to whether under prior evolving common law there had developed any implied covenant of habitability in residential leases, and if such covenant existed, what remedies were available to enforce it. I do agree with the majority's resolution of these questions insofar as they hold that before W.Va.Code, 37-6-30 [1978] became effective it would be proper to imply a covenant of habitability and that such covenant was not independent of the duty to pay rent. Everything else in the majority opinion is pure dicta and represents nothing more than the philosophy of the majority writer; its gratuitous pronouncements, arising as they do dehors of a justiciable case or controversy, cannot constitutionally *132 be considered the decisional law of this State and the lower courts are not properly bound to follow them, nor should they.
The majority opinion would imply that everyone has a natural law right to accommodations which would reflect credit on the Ritz Hotel. Experience in the last thirty years, however, adequately demonstrates that the creation of new law does not usually create new wealth; in fact, wealth can be equitably redistributed only after, not before, it has been created. Numerous recently decolonized, underdeveloped countries have learned to their chagrin that the social philosophy of the London School of Economics which stressed wealth redistribution over wealth generation might have been applicable to the United Kingdom of the 20th century but does not apply to primitive nations operating at the level of production which England enjoyed the day William I put the arrow through Harold the Saxon's eye.
The inability to redistribute wealth which does not exist which inexperienced administrators in former colonies found to their disappointment to be an unrepealable law of nature in the 1960s will daunt the majority's effort to create first class housing in West Virginia. The leading cases adopting an implied covenant of habitability arose predominantly in urban areas plagued by extensive ghettos in which slum dwellers were charged almost as much for slum housing as "middle class" people were charged for acceptable housing. Part of this phenomenon was the result of de facto racial discrimination, part of the urge of the poor to live in a hospitable community, and part of a lack of social skills which would permit the exploited to seek alternative accommodations. See Boston Housing Authority v. Hemingway, 363 Mass. 184, 293 N.E.2d 831 (1973) (Boston, Massachusetts); Green v. Superior Court, 10 Cal.3d 616, 111 Cal.Rptr. 704, 517 P.2d 1168 (1974) (San Francisco, California); Javins v. First National Realty Corp., 138 U.S.App.D.C. 369, 428 F.2d 1071 (1970) (Washington, D.C.).[2] Most of these areas make West Virginia's largest city of Charleston, which has a population well under eighty thousand, look like a virtual suburban haven. To the extent that deplorable conditions such as those found in Boston Housing Authority, Green and Javins[3] exist in West Virginia they should be corrected; no person should be required to pay the same amount of money for a shack that he would pay for a modern apartment and no one should be permitted to be exploited in the market place because he is a different color or has any other background which engenders prejudice. However, a covenant of habitability cannot serve to correct every conceivable inconvenience that interferes with a tenant's enjoyment of leased premises. In my estimation, a covenant of habitability amounts only to a landlord's promise that if something is provided with a leased premise then it will work absent some specific disclaimer. For example, if an elevator is provided, the tenant can expect it to operate; if a toilet is provided, the tenant can expect it to flush; if a heater is provided, the tenant can expect it to heat; but, a *133 tenant cannot expect a landlord to increase the size of rooms, provide elaborate lighting, or install the most expensive heating system ever devised by man.
I do not dispute for a moment that it would be wonderful if everyone could inhabit housing meeting both his taste and his budget but, unfortunately, the majority opinion cannot build houses, lower rents, or in any other way create more housing than already exists. Many people live in quarters which are less than luxurious because they cannot afford to pay more than what they already pay for rent. Ritz Hotel type housing cannot be provided where none otherwise exists unless someone pays for it. In our economy that means either (1) the landlord, (2) the tenant, or (3) the government. The government is trying to do its share, but its resources are limited.[4] The landlord cannot make substantial renovations without passing his costs on to the tenant, and the tenant may then find that he has been given more luxury than he can afford. It is very much as if one were to write an opinion which implied that everyone had a natural law right to a Rolls Royce and that an action in warranty would lie against all other automobile manufacturers if they provided anything less elegant. Many damage awards might follow, but eventually all other automobile manufacturers would be out of business, notwithstanding that very few Rolls Royces had come into the hands of those whom the opinion was intended to help.
We do not do the people of this State a favor by taking delapidated houses off the rental market if concomitantly we cannot provide alternative housing.[5] Furthermore, we should not place ourselves in the position of the totalitarians who, allegedly, come the Revolution, intend to force feed strawberries and cream down the throats of everyone, notwithstanding any individual's abhorrence of strawberries and cream.[6]
*134 While I find the greater portion of the majority opinion to be distasteful, I am especially distressed by the gratuitous pronouncements concerning both payment of rent into court and waivers, as neither question in the context of the new statute was fairly raised. I feel compelled to address these issues because they were addressed by the majority, if only to demonstrate that far greater refinement will be required of this area of the law as the court is educated by arguments made in the context of well developed records. First among the tasks of the future will be the development of a detailed typology of differing substandard housing situations to which we may apply rules calculated at all times to maximize availability of housing while minimizing exploitation. In that regard, a judicial definition of exploitation is itself a Herculean task; certainly it has vexed economists since time out of mind.
The majority obviously does not understand the purport of W.Va.Code, 37-6-30(c) [1978] which will apply to all future cases which provides:
None of the provisions of this section [warranty of habitability] shall be deemed to require the landlord to make repairs when the tenant is in arrears in payment of rent.
This section, in my opinion, effectively precludes the requirement that a landlord make a motion and present supporting proof before rent must be paid into the court during an action based on a covenant of habitability. Even absent that section, logic and practical economics dictate automatic payment of rent into court as a condition precedent to asserting the defense of violation of the covenant of habitability in an eviction proceeding. Clearly the tenant expected to pay rent when he leased the premises; therefore, he is faced with no unforeseen expense and does not stand to suffer since if he is successful all or part of the amount paid will be returned to him. On the other hand, the landlord stands to suffer significantly if a displeased tenant can avoid rental payment simply by pleading breach of a covenant of habitability without providing any security for payment to a landlord who may be ultimately vindicated. In reality, the majority has inadvertently increased the costs to all tenants by forcing landlords to pass along to all tenants, where the elasticity of demand for housing is low, the cost of tenants who do not pay rent. Under the majority opinion, if a landlord seeks to evict a nonpaying tenant, the tenant can file a frivolous answer based on a breach of covenant, demand a hearing, and deprive the landlord of rent until final resolution of the dispute, absent a motion by the landlord. In those circuits where the trial judges are impartial, there will be a liberal granting of these motions and a requirement that money be paid into court; nonetheless, the cost of doing business has increased considerably. I predict landlords will exact higher deposits where they can, and that where landlords find themselves vexed by unwarranted lawsuits they will push up everyone's rent to cover their costs.
In this regard the neutrality of the process has not been improved; the burden of lack of neutrality has merely shifted from the lessee to the lessor. Under prior law, where the covenants to maintain the premises and the covenant to pay rent were considered independent, the tenant suffered the burden of the process as he could seldom sustain an ancillary lawsuit to recover rent paid for inadequate dwellings after an eviction proceeding. Now, however, the landlord is burdened because most tenants are judgment proof; it is not practical to sue absconding tenants in an effort to get blood from proverbial stones. As tenants know this, they will soon become accustomed to awaiting an eviction proceeding, filing an answer claiming breach of warranty, demanding a hearing, and delaying the landlord in his eviction proceeding for at least four months. In that event the process  not the merits of the case either way  *135 will deny just landlords of their rightful recompense. However, if the tenant is required to pay money into court immediately, while the landlord is inconvenienced with regard to his cash flow, he is secure in his ultimate payment if he is without fault. Furthermore, there is much less likelihood that the process will be abused and that frivolous answers will be filed merely for the purpose of extending free tenancies. Moreover, the tenant will also be protected in a way he never was before. Thus either by an irrepressible desire to make a populist speech or an enormously unrefined thought process the majority opinion has deprived us of an opportunity to improve the total process rather than merely shifting the burden of its imperfections.
The majority's holding that waivers are per se contrary to public policy goes farther than necessary to avoid the slum ghetto problem. It is in this regard that we shall be required to develop a detailed typology of different substandard housing situations. Printed leases which automatically provide a pro forma waiver of all implied covenants of habitability should not be automatically enforceable; however, where two intelligent parties actually bargain for less than elegant premises, the amount of the rent charged reflects that bargain in a reasonable way, and the court can infer from the surrounding circumstances that no unfair advantage has been taken of a tenant based on the landlord's exploitation of the inelasticities of demand for housing, the contract should be able to provide for a waiver. In this area the Court should be able to go behind the printed contract on grounds akin to those which recognize special rules with regard to contracts of adhesion. This is in consonance with a similar holding of ours in the field of arbitration, Board of Education of the County of Berkeley v. W. Harley Miller, Inc., W.Va., 236 S.E.2d 439 (1977) where we distinguished between arbitration clauses which are thrust upon unsuspecting consumers and arbitration clauses for which the parties bargain. While with regard to residential rental property the contract usually has a non-commercial consumer on one side and an experienced businessman lessor on the other, the parties can nonetheless intelligently bargain for a waiver, and the primary evidence of such bargaining process is a rent which reasonably reflects the value of the property.
The courts are aware of the inelasticity of demand for housing in some parts of West Virginia and the cases cited by the majority have properly attempted to avoid outrageous exploitation of market rigidities in comparable circumstances in other jurisdictions where lessors charge high rents from unfortunate people and provide nothing in return. Consequently a court should be able to look to certain objective evidence in determining whether the accommodations were bargained for or whether the landlord has exploited the distress of his tenants. Such factors as the price of the residence, the employment record of the tenant, the age group of the tenant, the level of social skills of the tenant, the length of the lease, and the overall return on the rented premises should all bear on the problem. Where tenants are routinely of a class of itinerants who rent month to month, or taking a lease, routinely leave upon no notice, then the landlord must obviously rent at a higher monthly rental than if he had tenants who have been in the same dwelling for years. If the community is composed of renters who present peculiar problems, such as students or persons with very low social skills who routinely tear the place apart, then this unpleasant fact of life must bear upon the cost of doing business and must be reflected in the rent; however, where most tenants are retired persons who have owned their own homes, have a high sense of responsibility, and routinely provide their own minor maintenance, then the market rent should be appropriately lower. The reader may object in this regard that I have unfairly characterized some classes of tenants and quite possibly I have. That merely reinforces the preeminent deficiency of the majority opinion, i. e., making law which exceeds the requirements of the factual context in which it arose. Ultimately a competent circuit court should have the opportunity to develop the question of whether any particular subsample of tenants *136 present peculiar problems; until that time I must rely upon my own quite inadequate experience to point out the need for further development of the rules if we are not to achieve a result entirely contrary to what we intended.
While the amount of rent alone is not entirely dispositive of the issue of whether objectively the waiver was intelligently bargained for, nonetheless, it is the starting point. Where delapidated premises are rented to persons for prices which are equal to or almost equal to those charged for adequate housing, then the burden should be upon the landlord to show the market conditions which require him to charge the rents he charges and to justify the contract by demonstrating that due to peculiar conditions his overall rate of return to capital and his own labor does not exceed a fair rate of return.
I believe that the majority opinion is a philosophical speech which is not only uncalled for, but which demonstrates a totally deficient lack of refinement. As with all populist pronouncements in the modern world, the majority opinion has attempted to use a cudgel wielded by a cyclops to do work which can be accomplished only by a skilled athlete using a rapier. There is substantial wisdom to the common law tradition which countenances evolution of the decisional law only in the context of real cases and controversies. Discrete changes predicated on detailed development of factual situations helps preclude cyclopsesque blundering, i. e., the making of grandiose policy upon insufficient information.
MILLER, Justice, concurring in part and dissenting in part:
I find myself in basic agreement with the majority opinion that this Court may properly, as have other courts, fashion an implied covenant of habitability and determine what remedies are available under the doctrine.
However, it is in the area of the available remedies that I diverge from the majority opinion. I am distressed that the majority fails to accord the tenant the right to repair the defect and deduct this cost from his rent, a remedy that is almost universally accorded in this situation. I am further concerned that Syllabus Point 5,[1] relating to the measure of damages, is not the correct damage rule and may ultimately cause much mischief.

I
I find the majority's rejection of a repair and deduct remedy rather strange, particularly since there are no reasons given why this remedy should not be allowed. Most courts which have adopted the implied warranty of habitability doctrine have sanctioned this remedy.[2]
The implied warranty of habitability is bottomed on the premise that there are certain minimal standards of habitability arising from a residential lease which the law implies. This is analogous to the common law warranty or covenant of the landlord to keep the leased premises in a reasonable state of repair. The covenant to repair had to be expressly extended, but upon its breach by the landlord the tenant could, after due notice to the landlord, repair the defect and deduct the cost of repairs from his rent, as stated in 49 Am.Jur.2d Landlord and Tenant § 842:
"It is well established that upon the breach by a landlord of his covenant to *137 repair, the tenant may make the repairs and recover the reasonable expense or cost thereof from the landlord or charge it against the rent."
This was not the only remedy available to the tenant where the landlord breached his covenant to repair. The remedies are summarized in 28 A.L.R.2d 446, 452 (1953), and bear a striking similarity to the remedies made available on breach of an implied warranty of habitability:
"In one recent case the court has summarized the remedies of a tenant where the landlord has breached a covenant to repair, as follows: `Three remedies are available to a tenant where a landlord fails to perform a lease covenant: (1) Upon the landlord's failure of performance, the tenant can perform it at his own expense and defalk the cost of such performance from the amount of rent due and payable; or (2) The tenant can surrender the possession of the premises to relieve himself from any further payment of rent; or (3) He can retain possession of the premises and deduct from the rent the difference between the rental value of the premises as it would have been if the lease had been fully complied with by the landlord and its rental value in the condition it actually was.' Siddall v. Burke (1940, Pa.) 29 Del.Co. 530."
This law is not foreign to our jurisdiction, as demonstrated by the case of Cheuvront v. Bee, 44 W.Va. 103, 105-106, 28 S.E. 751, 752 (1897):
"`Where a landlord has agreed to repair the demised premises, and does not do so, the tenant has several remedies. He may abandon the premises, if by reason of the nonrepair they are rendered untenantable, or he may make the repairs, and deduct the cost from the rent. The tenant may also sue for damages.' 12 Am. & Eng.Enc.Law, 727. . . . The tenant, however, having the right to make the repairs at the expense of, and charge them to, the landlord, and deduct them from the rent, could regard them as payments on the rent, and file an account thereof with his plea of payment. Or he could file his special plea of recoupment, in its nature a plea of offsets, limited to such sums as he had the right to recoup against the rent. . . ."
Cheuvront also requires the tenant to give the landlord a reasonable notice to make the repairs before the tenant can undertake the repairs:
"Where the landlord covenants to repair, and neglects to do so, after having been notified, the tenant may, after a reasonable time, make the repairs and charge the landlord." [44 W.Va. at 106, 28 S.E. at 752]
A repair and deduct remedy provides a simple and expeditious means of alleviating a breach of an implied warranty of habitability.[3] It is not unjust to the landlord, since he must be given prior notice of the defect and an opportunity to repair it before the tenant can do so. It hardly seems likely that the tenant would be extravagant in his repairs, since it is his money that must be used initially.

II
Of more major concern is the damage rule announced in Syllabus Point 5, and more fully explained beginning at page 127 of the majority opinion. It is manifestly unfair to permit the tenant to recover damages based not on the actual rent he is paying, but on the hypothetical figure of the fair rental value of the property as it would be without any breach of the warranty of habitability.
The historical and fundamental rule underlying all compensatory damages is that the law seeks to redress for one's actual losses, but not to bestow a profit on the *138 injured party. 22 Am.Jur.2d Damages §§ 11-13; 25 C.J.S. Damages § 17; 5B M.J. Damages §§ 7, 18. This is true whether the injury arises by virtue of a tort or breach of contract. Stenger v. Hope Natural Gas Co., 139 W.Va. 549, 561-66, 80 S.E.2d 889, 897-99 (1954); Horn v. Bowen, 136 W.Va. 465, 469, 67 S.E.2d 737, 739 (1951). While there may be some exceptions to this rule in the case of commercial contracts or leases where lost profits on the contract can be considered, certainly these considerations are not warranted in a purely residential lease. The doctrine of implied warranty of habitability is exclusively confined to residential leases.
Again, some analogy can be made to the measure of damages where there is a breach on the part of the landlord of his covenant to keep the premises in repair. Admittedly, some of the cases in this area are concerned with commercial property and may involve an element of an advantageous bargain on the actual rent, such that the courts are willing at times to permit a showing of value above the actual rent.
I do not believe this element can be considered with respect to an implied warranty of habitability on residential property. Without an extensive review of individual cases, I believe that where there is a breach of a covenant to repair, the rule is that the measure of damages is the actual rent less the rental value in the defective condition. 49 Am.Jur.2d Landlord and Tenant § 844; 51 C.J.S. Landlord and Tenant § 373(5); Annot., 28 A.L.R. 1448 (1924); 28 A.L.R.2d 446 (1953). Indeed, the plaintiffs do not appear to contend for a different rule, since they state in their Brief at page 40:
"The plaintiff[s] submit[s] that absent a total breach, the plaintiff[s] should be allowed a right of action or setoff of, at the option of the tenant, (1) the difference between the agreed rent and the fair market value of the premises in their defective condition, or (2) the percentage reduction of use and enjoyment."
Furthermore, I am persuaded that this is the majority rule in those cases where the courts have adopted the doctrine of the implied warranty of habitability, as illustrated by Kline v. Burns, 111 N.H. 87, 93-94, 276 A.2d 248, 252 (1971):
"If a material or substantial breach of the implied warranty of habitability is found, the measure of the tenant's damages is the difference between the agreed rent and the fair rental value of the premises as they were during their occupancy by the tenant in the unsafe, unsanitary or unfit condition. In other words, the tenant's rent liability will be the reasonable rental value of the premises in their condition while occupied. Pines v. Perssion, 14 Wis.2d 590, 597, 111 N.W.2d 409, 413 (1961); William J. Davis, Inc. v. Slade, 271 A.2d 412, 416 (D.C.Ct.App. 1970); 11 Williston, Contracts s. 1343 (3d ed. W.H.E. Jaeger 1968); see Coos Lumber Co. v. Builders Supply Co., 104 N.H. 404, 408, 188 A.2d 330, 332 (1963)."
See King v. Moorehead, 495 S.W.2d 65, 76 (Mo.App.1973).
The majority cites Green v. Superior Court, 10 Cal.3d 616, 638-39, 111 Cal.Rptr. 704, 719, 517 P.2d 1168, 1183 (1974), which set its damage formula in a most peripheral fashion without analysis to any general damage rule. It relied primarily on Mease v. Fox, 200 N.W.2d 791, 797 (Iowa 1972).
Green did cite Boston Housing Authority v. Hemingway, 363 Mass. 184, 293 N.E.2d 831 (1973), and Academy Spires, Inc. v. Jones, 108 N.J.Super. 395, 261 A.2d 413 (1970), but they do not support the Green and Mease rule. Boston Housing suggested that the actual rent may be evidence of the value as warranted. [363 Mass. at 203, 293 N.E.2d at 845]
In Academy Spires, supra, McKenna v. Begin, 362 N.E.2d 548 (Mass.App.1977), and Glyco v. Schultz, 35 Ohio Misc. 25, 62 Ohio Ops.2d 459, 289 N.E.2d 919 (Sylvania Mun.Ct. 1972), the courts adopted a percentage reduction in the actual rent based on a reduction in the use of the premises resulting from the breach of the implied warranty, a point acknowledged by the majority in this case at page 127. This rule is not materially different from the one I have discussed.
*139 By using the actual rent and deducting from it the fair rental value of the leased premises with the breaches of the implied warranty of habitability, a closer approximation of the actual damages incurred can be obtained. To use the majority's illustration, if a tenant leased property at $150 a month and it was found that as a result of various breaches of the implied warranty of habitability its fair rental value is only $100 a month, then the tenant's damages are $50 a month.
The majority would calculate the tenant's damages at $100 a month based on the hypothetical fair rental value of the premises if there were no breach of the implied warranty of habitability, which is $200 a month, and subtract the value in its present state with the breach, which is $100. The tenant is not paying $200 in rent, but only $150, and thus he obtains $50 a month in damages over what he is actually out-of-pocket.
A moment's reflection will reveal that there are residential apartments which a landlord will rent that are neither new nor in perfect condition, and as a consequence he is willing to take a realistic rental for them. He should not be penalized, nor the tenant rewarded, on the basis of a damage rule which begins with the basic assumption that the parties dealt on the theory that the apartment was without any defect or breach of an implied warranty of habitability. Common sense dictates an awareness that there are tenants who do not possess sufficient funds to rent an apartment which is completely free of any defects, and landlords who, because of modest financial circumstances, cannot offer the most modern residential apartments.
This more realistic damage rule does not mean that the tenant is waiving any breach of the implied warranty of habitability, since the rule relates only to the measure of damages he can recover from the landlord.
He can still utilize the breach of implied warranty of habitability as a defense to an action for unlawful detainer or as an offset by way of damages in the landlord's suit for rent. He can leave the premises and end his obligation to pay rent or bring his own action for damages. What he ought not to be able to do is obtain monetary damages that bear no relationship to his actual rent when contrasted with the actual condition of the premises. This is completely contrary to any recognized rule for calculating compensatory damages.
I do not sense that the majority is holding that because there may be breaches of the implied warranty of habitability, the landlord may not regain possession of the premises upon the expiration of the term of the lease. This is the traditional function of an unlawful entry and detainer action to regain possession at expiration of the term. W.Va.Code, 55-3-1; Lewis v. Welch Wholesale Flour & Feed Co., 90 W.Va. 471, 111 S.E. 158 (1922); Hukill v. Guffey, 37 W.Va. 425, 450-56, 16 S.E. 544, 552-54 (1892), writ of error dismissed, 163 U.S. 690, 16 S.Ct. 1202, 41 L.Ed. 306 (1895).
At common law, in the absence of statute or an express provision in the lease, the non-payment of rent did not operate to confer on the landlord the right to regain possession of the premises. Gale v. Oil Run Petroleum Co., 6 W.Va. 200 (1873); 49 Am. Jur.2d Landlord and Tenant § 1029. However, since the inception of this State, the right to re-enter for rent arrearage has been controlled by statute, W.Va.Code, 37-6-19, which permits re-entry through the use of an unlawful detainer action if the rent becomes in arrears. Kincaid v. Patterson, 129 W.Va. 234, 239-41, 39 S.E.2d 920, 924-25 (1946). It is this statutory authorization for the use of unlawful entry and detainer for the non-payment of rent which is interdicted by the implied warranty of habitability until the habitability-rent issue is settled.
Where the landlord seeks an unlawful entry and detainer to regain the possession of the premises on the basis that the term of the lease has expired, I would not view the implied warranty of habitability as preventing the exercise of such remedy.[4]
*140 Based on the considerations that I have suggested, I do not believe the implied warranty of habitability does any great violence to our existing landlord-tenant law. Since the Legislature has left open the damage question in setting the various implied warranties of habitability under W.Va.Code, 37-6-30, it may be possible to rectify the damage rule espoused by the majority under this statute or an interpretation thereof.
NOTES
[1] "If . . . the landlord is at the time of the letting aware of the dangerous or unhealthful condition of the premises arising from latent defects, it is his duty to disclose such fact, and his failure to do so may constitute a fraud rendering him not only liable to the tenant for resulting injuries, but also authorizing the tenant to abandon the possession and thereby escape liability for future rents." 16 R.C.L. § 270 at n. 4 (1917).
[2] "The modern apartment dweller more closely resembles the guest in an inn than he resembles an agrarian tenant, but the law has not generally recognized the similarity." J. Levi, P. Hablutzel, L. Rosenberg & J. White, Model Residential Landlord-Tenant Code 6-7 (Tent. Draft 1969). Under the old common law, the keepers of inns owed to their shelter-seeking tenants much more substantial obligations than the normal landlord owed the farmer-tenant. Hence, "[e]ven the old common law courts responded with a different rule for a landlord-tenant relationship which did not conform to the model of the usual agrarian lease." Javins v. First National Realty Corp., 138 U.S.App.D.C. 369 at n. 33, 428 F.2d 1071 at n. 33, cert. denied, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970).
[3] "[U]nlike the multi-skilled lessee of old, today's city dweller generally has a single, specialized skill unrelated to maintenance work. Furthermore, whereas an agrarian lessee frequently remained on a single plot of land for his entire life, today's urban tenant is more mobile than ever; a tenant's limited tenure in a specific apartment will frequently not justify efforts at extensive repairs. Finally, the expense of needed repairs will often be outside the reach of many tenants for `[l]ow and middle income tenants, even if they were interested in making repairs, would be unable to obtain any financing for major repairs since they have no long-term interest in the property.'" Green v. Superior Court, 10 Cal.3d 616, 624-25, 111 Cal. Rptr. 704, 709, 517 P.2d 1168, 1173 (1974), quoting from Javins v. First National Realty Corp., supra, 138 U.S.App.D.C. at 376-377, 428 F.2d at 1078-79.
[4] "[U]rbanization and population growth have wrought an enormous transformation in the contemporary housing market creating a scarcity of adequate low cost housing in virtually every urban setting. This current state of the housing market is by no means unrelated to the common law duty to maintain habitable premises. For one thing, the severe shortage of low and moderate cost housing has left tenants with little bargaining power through which they might gain express warranties of habitability from landlords, and thus the mechanism of the `free market' no longer serves as a viable means for fairly allocating the duty to repair leased premises between landlord and tenant. For another, the scarcity of adequate housing has limited further the adequacy of the tenant's right to inspect the premises; even when defects are apparent the low income tenant frequently has no realistic alternative but to accept such housing with the expectation that the landlord will make the necessary repairs. Finally, the shortage of available low cost housing has rendered inadequate the few remedies that common law courts previously have developed to ameliorate the harsh consequences of the traditional `no duty to repair' rule." Green v. Superior Court, supra, 10 Cal.3d at 625, 111 Cal.Rptr. at 709-10, 517 P.2d at 1173.
[5] "One who lets for a short [time] a house provided with all furnishings and appointments for immediate residence may be supposed to contract in reference to a well-understood purpose of the hirer to use it as a habitation. An important part of what the hirer pays for is the opportunity to enjoy it without delay, and without the expense of preparing it for use." Ingalls v. Hobbs, 156 Mass. 348, 31 N.E. 286 (1892).
[6] "Constructive eviction has proved an insufficient remedy for those most likely to have resort to it, low income tenants. The dilemma it raises for them is that they must continue to pay rent and endure the conditions of untenantability or abandon the premises and hope to find another dwelling which, in these times of severe housing shortage, is likely to be as uninhabitable as the last." King v. Moorehead, supra at 76-77; see Wilkinson v. Searls, 155 W.Va. 475, 184 S.E.2d 735 (1971). Even when alternative shelter is found, the tenant runs the risk of not being able to prove the abandoned premises were rendered uninhabitable and, consequently, might be held liable for substantial rent. See W.Va.Code §§ 37-6-6, 7 & 8. Another pitfall in constructive eviction is that the tenant is deemed to "waive" the defects unless he abandons within a "reasonable time" Rapacz, "Origin and Evolution of Constructive Eviction in the United States," 1 DePaul L.Rev. 69, 75-79 (1951).
[7] Of course, any such codes or ordinances would tend to derogate the common law rules only within the geographic area encompassed by the county or municipality. Certain rural areas might not be covered by such codes or ordinances. But abrogation of the common law no-repair rule is nonetheless achieved by the legislative enactments taken as a whole.
[8] In 1963 the Legislature, by enacting the Uniform Commercial Code, implied into contracts for the sale of goods a warranty of merchantability, W.Va.Code § 46-2-314, and of fitness for particular purpose, W.Va.Code § 46-2-315, thus drastically changing the common law of contracts. "These implied warranties have become widely accepted and well established features of the common law, supported by the overwhelming body of case law." Javins v. First National Realty Corp., 138 U.S.App.D.C. 369, 373, 428 F.2d 1071, 1075, cert. denied, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970); see W. Prosser, Torts §§ 95, 97 (4th ed. 1971). "In most significant respects, the modern urban tenant is in the same position as any other normal consumer of goods . . . Through a residential lease, a tenant seeks to purchase `housing' from his landlord for a specified period of time. The landlord `sells' housing, enjoying a much greater opportunity, incentive and capacity than a tenant to inspect and maintain the condition of his apartment building. A tenant may reasonably expect that the product he is purchasing is fit for the purpose for which it is obtained, that is, a living unit. Moreover, since a lease contract specifies a designated period of time during which the tenant has a right to inhabit the premises, the tenant may legitimately expect that the premises will be fit for such habitation for the duration of the term of the lease. It is just such reasonable expectations of consumers which the modern `implied warranty' decisions endow with formal, legal protection." Green v. Superior County Court, supra, 10 Cal.3d at 627, 111 Cal.Rptr. at 711, 517 P.2d at 1175. While landlord-tenant relations are not covered by the U.C.C., this apt analogy can be drawn as we scrutinize legislative intent.
[9] Most jurisdictions have expressly or impliedly refused to extend the implied warranty of habitability into commercial leases. See, e. g., E. P. Hinkel & Co. v. Manhattan Co., 165 U.S. App.D.C. 140, 506 F.2d 201 (1974); Interstate Restaurants, Inc. v. Halsa Corp., 309 A.2d 108 (D.C.App.1973); Restatement (Second) of Property § 5.1 Caveat & Comment (1977). We express no position on that point at this time.
[10] Twenty-nine states and the District of Columbia have adopted by statute or case law the implied warranty of habitability. Alaska: Alaska Stat. §§ 34.03.100, 34.03.160, 34.03.180 (1974); Arizona: Ariz.Rev.Stat. Ann. §§ 33-1324, 1361 (1974); California: Cal.Civ.Code § 1941 (West 1974) and Green v. Superior Court, 10 Cal.3d 616, 111 Cal.Rptr. 704, 517 P.2d 1168 (1974); Connecticut: Conn.Gen.Stat. Ann. §§ 47-24 et seq. and Todd v. May, 6 Conn.Cir.Ct. 731, 316 A.2d 793 (1973); Delaware: Del.Code Ann. tit. 25 § 5305 (1972); District of Columbia: Javins v. First National Realty Corp., 138 U.S.App.D.C. 369, 428 F.2d 1071 (1970), cert. denied, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970); Florida: Fla.Stat. Ann. §§ 83.51, 83.56 (1973); Georgia: Ga.Code Ann. § 61-111 (1974) and Stack v. Harris, 111 Ga. 149, 36 S.E. 615 (1900); Hawaii: Haw.Rev. Stat. § 521-42 (1974) and Lemle v. Breeden, 51 Haw. 426, 462 P.2d 470 (1969); Illinois: Jack Spring, Inc. v. Little, 50 Ill.2d 351, 280 N.E.2d 208 (1972); Indiana: Old Town Development Co. v. Langford, Ind.Ct.App.2d (June 17, 1976); Iowa: Mease v. Fox, 200 N.W.2d 791 (Iowa 1972); Kansas: Steele v. Latimer, 214 Kan. 329, 521 P.2d 304 (1974); Kentucky: Ky.Rev. Stat.Ann. §§ 383-595, 383-625; Maine: Me. Rev.Stat.Ann. tit. 14, § 6021 (1974) (allows cancellation of lease); Maryland: Baltimore City Pub. Local Laws §§ 9-9, 9-10, 9-14.1 and Montgomery County Code, Fair Landlord-Tenant Relations ch. 93A; Massachusetts: Mass. Gen.Laws Ann. ch. 239, § 8A (1974) and Boston Housing Authority v. Hemingway, 363 Mass. 184, 293 N.E.2d 831 (1973); Michigan: Mich. Comp.Laws Ann. § 554.139 (1974) and Fritz v. Warthen, 298 Minn. 54, 213 N.W.2d 339 (1973); Missouri: King v. Moorehead, 495 S.W.2d 65 (Mo.Ct.App.1973); New Hampshire: Kline v. Burns, 111 N.H. 87, 276 A.2d 248 (1971); New Jersey: Marini v. Ireland, 56 N.J. 130, 265 A.2d 526 (1970); New York: New York City, Real Prop., Actions § 755 (1963); Ohio: Ohio Rev. Code Ann. §§ 5321.07 (1974) and Glyco v. Schultz, 35 Ohio Misc. 25, 289 N.E.2d 919 (Sylvania Mun.Ct.1972); Oregon: Or.Rev.Stat. §§ 91.770, 91.800 to .815 (1974); Pennsylvania: Commonwealth v. Monumental Properties, Inc., 459 Pa. 450, 329 A.2d 812 (1975); Virginia: Va.Code Ann. §§ 55-248.2, .13, .25; Washington: Wash.Rev.Code Ann. § 59.18.060 (1974) and Foisy v. Wyman, 83 Wash.2d 22, 515 P.2d 160 (1973) (en banc); Wisconsin: Pines v. Perssion, 14 Wis.2d 590, 111 N.W.2d 409 (1961); but see Posnanski v. Hood, 46 Wis.2d 172, 174 N.W.2d 528 (1970). Most of these changes were antedated by the innumerable commentators who advocated adoption of the implied warranty. See, e. g., Lesar, Landlord and Tenant Reform, 35 N.Y.U.L.Rev. 1279 (1960); Moskovitz, The Implied Warranty of Habitability: A New Doctrine Raising New Issues, 62 Cal.L.Rev. 1444 (1974); Skillern, Implied Warranties in Leases: The Need for Change, 44 Denver L.J. 387 (1967); Note, Implied Warranty of Habitability in Housing Leases, 21 Drake L.Rev. 300 (1972); Comment, Implied Warranty of Habitability: An Incipient Trend in the Law of Landlord-Tenant?, 40 Fordham L.Rev. 123 (1971); Comment, Implied Warranty of Habitability-Demise of the Traditional Doctrine of Caveat Emptor, 20 DePaul L.Rev. 955 (1971); Comment, Implied Warranty of Habitability in Residential Leases-A Defense to Landlord Eviction Actions, 23 U.Fla.L. Rev. 785 (1971); Comment, Plotting the Long-overdue Death of Caveat Emptor in Leased Housing, 6 U.San.Fran.L.Rev. 147 (1971); Comment, Tenant Remedies-the Implied Warranty of Fitness and Habitability, 16 Vill.L.Rev. 710 (1971); 20 Buff.L.Rev. 567 (1971); 39 Geo. Wash.L.Rev. 152 (1970).
[11] § 37-6-30. Landlord to deliver premises in fit and habitable condition; duty to maintain premises.

With respect to residential property:
(a) A landlord shall:
(1) At the commencement of a tenancy, deliver the dwelling unit and surrounding premises in a fit and habitable condition, and shall thereafter maintain the leased property in such condition; and
(2) Maintain the leased property in a condition that meets requirements of applicable health, safety, fire and housing codes, unless the failure to meet those requirements is the fault of the tenant, a member of his family or other person on the premises with his consent; and
(3) In multiple housing units, keep clean, safe and in repair all common areas of the premises remaining under his control that are maintained for the use and benefit of his tenants; and
(4) Make all repairs necessary to keep the premises in a fit and habitable condition, unless said repairs were necessitated primarily by a lack of reasonable care by the tenant, a member of his family or other person on the premises with his consent; and
(5) Maintain in good and safe working order and condition all electrical, plumbing, sanitary, heating, ventilating, air-conditioning and other facilities and appliances, including elevators, supplied or repaired to be supplied by him by written or oral agreement or by law; and
(6) In multiple housing units, provide and maintain appropriate conveniences for the removal of ashes, garbage, rubbish and other waste incidental to the occupancy of the dwelling unit; and
(7) With respect to dwelling units supplied by direct public utility connections, supply running water and reasonable amounts of hot water at all times, and reasonable heat between the first day of October and the last day of April, except where the dwelling unit is so constructed that running water, heat or hot water is generated by an installation within the exclusive control of the tenant.
(b) If a landlord's duty under the rental agreement exceeds a duty imposed by this section, that portion of the rental agreement imposing a greater duty shall control.
(c) None of the provisions of this section shall be deemed to require the landlord to make repairs when the tenant is in arrears in payment of rent.
(d) For the purposes of this section, the term "multiple housing unit" shall mean a dwelling which contains a room or group of rooms located within a building or structure forming more than one habitable unit for occupants for living, sleeping, eating and cooking.
[12] "Obviously, the ordinary lease is in part a bilateral contract, and it is so regarded by the civil law. There is no reason why it could not be recognized for what it is, both a conveyance and a contract. But the doctrine that a lease is a conveyance and the rules based thereon were established before the development of the concept of mutual dependency in contracts, and the Anglo-American courts have been slow to apply the doctrine of the contractual provisions of leases." Lesar, Landlord and Tenant Reform, 35 N.Y.U.L.Rev. 1279, 1281 (1960).
[13] Contract law is to determine the rights and responsibilities of only the parties to the lease agreement. We intend in no way to change statutory, common law, or case law definitions of "real property," nor are we today altering the law on recordation, descent, conveyancing, creditors' rights, etc.
[14] It appears, however, that the Legislature in the new W.Va.Code § 37-6-30(c) has specifically rendered unavailable the contract remedy of specific performance to a tenant "in arrears in payment of rent." This provision may tend to accelerate that which some say is the major underlying problem:

"The major limitations of the warranty of habitability lie in its inherent failure to mandate repair of the premises by the landlord, to provide enough money damages for tenants to make substantial repairs to deteriorated housing, and to be self-enforcing. A tenant may have to return to court month after month to obtain a rent abatement from a recalcitrant landlord. Because the economic sanction of the warranty of habitability is limited, moreover, tenants will often find that landlords would rather accept the abatement than make the repairs, thus leaving the tenant with a lower monthly rent but unimproved living conditions. Whether the rent reduction will be sufficient to allow the tenant to make the repairs personally will depend on the individual case. A.B.A. Advisory Commission on Urban Growth, Housing For All Under Law, 596 (1978).
[15] Other courts have similarly held the breach to be a defense, basing their holding on the landlord's statutory duty to provide fit and habitable dwellings:

"The legislative objective in enacting the implied covenants of habitability is clearly to assure adequate and tenantable housing within the state. That objective is promoted by permitting breach of the statutory covenants to be asserted as a defense in unlawful detainer actions. If a landlord is entitled to regain possession of the premises in spite of his failure to fulfill the covenants, this purpose would be frustrated. A tenant would be given little choice in asserting his statutory right to tenantable housing if his only alternatives were abandonment of the premises or continued payment of rent to which the landlord is not entitled because of the conditions." Fritz v. Warthen, 298 Minn. 54, 59-60, 213 N.W.2d 339, 342 (1973).
[16] "Indeed it is highly questionable whether the percentage reduction of use approach can ever result in a figure which is objectively justifiable, even as an estimate. Any real attempt to prove percentage reduction in use must consider the time and floor space affected by the defects, assuming this date is available from the tenant. But this is only the beginning, for some weight must be attributed to each affected facility. If there is no hot water in the bathroom, the tenant cannot use the bath, but he can use the sink some of the time and the toilet all the time. Also, he may use the toilet more than the sink, the sink more than the bath  all of which, it would seem, is crucial to determining the percentage reduction in use of the bathroom. Moreover, after this is decided, it must be determined how much this reduces the use of the premises as a whole. Should this be done according to the percentage of floor space taken up by the bathroom, even if the tenant uses the bathroom more than other parts of the premises? Is a storeroom or closet in use even when the tenant is not there but his belongings are? And this process must be repeated for each defect." M. Moscovitz, op. cit. supra at 1469.
[17] "On the [one] hand, there may be instances in which minor violations in conjunction with major violations or a multitude of minor violations with a cumulative effect on habitability should be taken into consideration in reducing rent." McKenna v. Begin, Mass.App., 362 N.E.2d 548, 551 (1977).

The case of Academy Spires, Inc. v. Brown, 111 N.J.Super. 477, 268 A.2d 556 (Dist.Ct.1970) outlines well the general scope of the warranty of habitability. In that case, the tenant complained of a number of defects in his apartment including (1) the failure to supply heat and water, (2) the malfunctioning of an incinerator, (3) the failure in hot water supply, (4) several leaks in the bathroom, (5) defective venetian blinds, (6) cracks in plaster walls, (7) unpainted interior walls, and (8) an inoperative elevator. The Court held at 559 that:
"Some of these clearly go to the bare living requirements. In a modern society one cannot be expected to live in a multi-storied apartment building without heat, hot water, garbage disposal or elevator service. Failure to supply such things is a breach of the implied covenant of habitability. Malfunction of venetian blinds, water leaks, wall cracks, lack of painting, at least of the magnitude presented here, go to what may be called `amenities.' Living with lack of painting, water leaks and defective venetian blinds may be unpleasant, aesthetically unsatisfying, but does not come within the category of uninhabitability. Such things will not be considered in diminution of the rent."
[1] I have pondered whether I should disqualify myself in this case based on the fact that I own two substantial residential rental developments as disclosed by my conflict of interest statement on file in the office of the Clerk of the Supreme Court. No motion was made for my disqualification; nonetheless, I feel called upon to explain why I have decided it proper for me to sit on this case. My ownership of residential property extends to only two developments, Covered Bridge Terrace in Philippi, West Virginia, and Forest Festival Terrace in Elkins, West Virginia, the first of which was built in 1976-77 and the second in 1978-79. Both projects are the largest developments in their respective market areas and each represents the most modern and, concomitantly, the most expensive rental dwelling units available in each's respective county. Both were constructed under the supervision of a licensed architect and meet all fire, health, and safety codes and all units are complete with all appliances, heat, air conditioning, and better than 85% of them have two bathrooms. Each project has a person responsible for maintenance.

Accordingly, it does not appear that the case under consideration, dealing as it does primarily with slum property, has any greater applicability to me personally than the majority of cases involving public questions.
[2] While states which are considered more predominantly rural than urban have adopted an implied covenant of habitability, their adoptions are not considered "leading" decisions. In fact, it is rare to find a rural state case applying a covenant of habitability to afford a tenant relief when conditions similar to those existing in urban areas have not been demonstrated. See Steele v. Latimer, 214 Kan. 329, 521 P.2d 304 (1974); Todd v. May, 6 Conn. Cir.Ct. 731, 316 A.2d 793 (1973); Kline v. Burns, 111 N.H. 87, 276 A.2d 248 (1971). This in no way implies that only tenants in urban areas deserve the protection of a covenant of habitability, but rather only that the conditions leading to adoption of the implied covenant in urban areas are the type of conditions which we should keep in mind in developing the proper application of the covenant in future cases.
[3] Boston Housing Authority involved rental premises found by the city inspection department to "`. . . endanger or materially impair the health or safety, and the well-being of any tenant therein or persons occupying [the] . . . property.'" In Green, the premises under consideration had been found to violate eighty housing code provisions and were subject to condemnation hearings, while in Javins 1500 housing regulation violations were cited.
[4] According to a spokesman for the Department of Housing and Urban Development, over six million dollars are available in fiscal year 1979 for construction of rental housing to serve lower income persons. As these units are extensively regulated, 24 C.F.R. 880.111, there exists no problem with their being habitable, at least at the time they are first completed.
[5] A good example is the federal urban renewal program enacted in 1949 to:

. . . eliminate substandard and other inadequate housing through clearance of slums and blighted areas;
. . . stimulate sufficient housing production and community development to remedy the housing shortage;
. . . realize the goal of a decent home and a suitable living environment for every American family.
These goals were laudable but not practical; instead of improving living conditions, the program actually decreased the supply of low-rent housing. Between 1950 and 1960, approximately 126,000 housing units were destroyed under the urban renewal program while only approximately 28,000 were completed in the same decade. The destroyed homes were almost exclusively low-rent units costing less than $100 a month; the new homes rented in 1962 at an average rental of $195 a month. Hence it was virtually impossible for any person displaced by urban renewal to return unless he could get admitted to public housing units, only 3,000 of which were constructed. The net effect was that those who before urban renewal had poor housing had none after urban renewal. See M. Anderson, Fiasco of Urban Renewal, Harvard Bsns. R. Vol. 43, January 1965, pp. 6-8 +.
[6] Perhaps some of the most grievous examples of poor housing in West Virginia are found when the tenants are also students; however, the student-tenant probably also presents the best example of possible intelligent bargaining leading to low rent and a waiver of the covenant of habitability. If a group of male students prefer to spend their money on the purchase of beer, the playing of pool, and the chasing of women instead of paying rent for luxurious accommodations, then they should be permitted to do so. Students are frequently lessees of slum dwellings at rather high prices partially because very few landlords of well-maintained property are interested in renting to students. While there are many responsible students, landlords predicate their rental practices on statistical averages, and, on the average, students are less mindful of other people's property than older persons. Furthermore, while the working family devote their premises to the nurture of their children and frequently dedicate it to the pursuit of peace and quiet as a relief from the pressures of the working world, the student is as likely to dedicate it to extensive social entertaining, and may be tempted to provide accommodations to as many of his friends as wish to use it as a transient abode. When there is a recognizable class of tenants who rejoice in "tearing the place apart" that pursuit must be accommodated in both the level of the rent and the quality of the dwelling.
[1] "When the warranty of habitability is breached, the tenant's damages are measured by the difference between the fair market value of the premises if they had been so warranted and the fair rental value of the premises as they were during the occupancy by the tenant in the unsafe and unsanitary condition. However, the tenant may additionally recover damages for annoyance and inconvenience proven to have resulted from the breach."
[2] See, e. g., Boston Housing Authority v. Hemingway, 363 Mass. 184, 192-93, 293 N.E.2d 831, 839 (1973); Marini v. Ireland, 56 N.J. 130, 146-47, 265 A.2d 526, 535, 40 A.L.R.3d 1356, 1367-68 (1970); Garcia v. Freeland Realty, Inc., 63 Misc.2d 937, 314 N.Y.S.2d 215 (N.Y. City Mun. Ct.1970); Pines v. Perssion, 14 Wis.2d 590, 592-93, 597, 111 N.W.2d 409, 411, 413 (1961); Annot., 40 A.L.R.3d 1369 (1971).
[3] Much the same remedy is embodied in Section 4.104(a)(1) of the Uniform Residential Landlord and Tenant Act, which has been adopted by twelve states:

"(1) [The tenant may] procure reasonable amounts of heat, hot water, running water, electric, gas, and other essential service during the period of the landlord's noncompliance and deduct their actual and reasonable cost from the rent; . . ." [7A Uniform Laws Ann., at 542-43]
[4] I avoid, as has the majority, expressing any view on the questions of a retaliatory eviction case. See, e. g., Robinson v. Diamond Housing Corporation, 150 U.S.App.D.C. 17, 463 F.2d 853 (1972); Hosey v. Club Van Cortlandt, 299 F.Supp. 501 (S.D.N.Y.1969); Alexander Hamilton Savings & Loan Association v. Whaley, 107 N.J.Super. 89, 257 A.2d 7 (1969); Dickhut v. Norton, 45 Wis.2d 389, 173 N.W.2d 297, 40 A.L.R.3d 740 (1970).